1

2

3

4                    UNITED STATES DISTRICT COURT

5                   EASTERN DISTRICT OF CALIFORNIA

6    KAREN SCHELLER,                      1:08-CV-00798-OWW-DLB

7                        Plaintiff,       MEMORANDUM DECISION RE
                                          PLAINTIFF KAREN SCHELLER'S
8         v.                              MOTION FOR SUMMARY JUDGMENT
                                          (Doc. 43) AND DEFENDANT
9    AMERICAN MEDICAL RESPONSE, INC., a   AMERICAN MEDICAL RESPONSE,
     foreign corporation, CINDY          INC.'S MOTION FOR SUMMARY
10   WOOLSTON, an individual, and DOES    JUDGMENT (Doc. 40.)
     1-25, inclusive,
11
                         Defendants.
12

13

14                        I.   INTRODUCTION

15        This   case   arises   out   of   Plaintiff   Karen   Scheller's

16   ("Scheller") January 20, 2005 workplace injury and the subsequent

17   dispute between Plaintiff and her employer, Defendant American

18   Medical Response, Inc. ("AMR"), concerning her post-injury

19   employment status, the accommodations - or lack thereof - provided

20   to her as a disabled employee, her ability to return to work as a

21   paramedic, and alleged statements made by AMR employees to

22   Plaintiff concerning her age.

23        Before the Court for decision are cross-motions for summary

24   judgment or, in the alternative, summary adjudication, brought by

25   Plaintiff and by Defendant AMR.[1]   Plaintiff has moved for summary

26

27        ───────────────

28        [1] Cindy Woolston was dismissed pursuant to stipulation on July
     2, 2009.  (Doc. 36.)

                                 1

1  adjudication on her disability discrimination claim only.
2  Plaintiff argues that she has established a prima facie case of
3  discrimination and no triable issues of fact remain as to: (1)
4  AMR's failure to accommodate Plaintiff's disability; and (2) AMR's
5  refusal to engage in the interactive process.

6  Defendant AMR has moved for summary judgment on all six claims
7  in the first amended complaint and the punitive damages request.
8  According to AMR, Plaintiff cannot establish material factual
9  disputes on any of her causes of action.  In particular, AMR argues
10  that Plaintiff could not perform the essential functions of her
11  job, with or without a reasonable accommodation, that Plaintiff was
12  accommodated pursuant to her extended leave of absence, and that
13  she did not experience any adverse employment action because of her
14  age.

15
16  **II.  FACTUAL BACKGROUND.[2]**

17  **A.   The Parties & Corporate Policies**

18  In January 2005, Plaintiff worked as a paramedic for AMR, a
19  provider of emergency and non-emergency medical transportation
20  throughout California.  Plaintiff was originally hired by AMR as a
21  part-time paramedic in December 1996.[3]  Plaintiff was promoted to

22
23  [2] The following background facts are taken from the parties'
24  submissions in connection with the motions and other documents on
   file in this case.  The parties have filed various evidentiary
25  objections to the evidence submitted in support of their
   adversary's motion for summary judgment.  In deciding the
26  cross-motions, no inadmissible evidence was considered.  The
   parties' evidentiary objections are moot.
27
28  [3] Specifically, Plaintiff was hired as a "casual paramedic"
   and stationed in AMR's Stanislaus County Division.  (Doc. 54-2,

**2**

a full-time paramedic in early 1999 and worked in that capacity until her January 2005 industrial injury.   Throughout her employment, Plaintiff worked out of AMR's Modesto offices, which serviced Stanislaus County.[4]

AMR and Health Care Workers' Union Local 250, AFL-CIO (the "Union") are parties to a collective bargaining agreement ("CBA") which states that employees can only be terminated for "just cause."   The CBA contains mandatory grievance procedures, consisting of three grievance "steps."   At all relevant times, Plaintiff was a member of the Union, the exclusive bargaining agent for a bargaining unit of AMR employees.

AMR maintains and distributes to its paramedics a "Position Description for Paramedics," which defines the responsibilities and requirements for AMR paramedics.   The document provides that paramedics are required to "lift and move patients as required to provide optimum care," as well as perform a number of physically-intensive activities, including kneeling, stooping, bending, leaning, and stopping.[5]   It is undisputed that Plaintiff received

_____

AMRS # 0235.)

[4] According to AMR's General Manager Cindy Woolston, 95% of its employees in Stanislaus County are paramedics, emergency medical technicians, or supervisors for individuals working in those professions.  Specifically, AMR employs 212 individuals in Stanislaus County: 198 are paramedics or EMTs, 3 field supervisors, and 11 other employees, including Ms. Wooston, two mechanics, and two human resources assistants.  (C. Woolston Decl., ¶ 2.)  There are less than five clerical and administrative employees in Stanislaus County.  (Id.)

[5] Paramedics were also expected to "constantly" perform "simple touching, walking, pushing, pulling, reaching, [and] sitting" as well as use and transport medical equipment, such as

1    a copy of this document during her tenure at AMR.

2          AMR also maintains a Transitional Work Assignment Policy (the
3    "Policy" or "TWA") for employees who experience a "significant
4    injury or illness that results in a restricted work status."
5    According to the Policy, "[t]ransitional work provides a means for
6    employees on a restricted duty status to continue making a
7    meaningful contribution in the workplace, within their ability, and
8    can help to temporarily reduce employee hardship caused by
9    disability-related wage loss."[6]   The Policy provides that the
10   provision of transitional work hours is "always at AMR's
11   discretion" and that "[e]ligible employees may be offered
12   transitional work assignments during a 120 calendar day period,
13   which begins on the date of injury/illness."

14

15         B.   **Plaintiff's Employment/Medical History With AMR**

16

17   gurneys, wheelchairs, defibrillators, suction equipment, vacuum
18   cleaners, and protective devices.

19         [6] To be considered eligible under the policy, the following
     criteria must be met:
20

21         (a)   Be an AMR employee;

22         (b)   Injury or illness occurred within the last 120
                 days;
23

24         (c)   Provided AMR with a current doctor's note that
                 indicates he/she is temporarily unable to work
25               his/her usual duties but can work modified duties;
                 and
26

27         (d)   Work restrictions that AMR is able and willing to
                 temporarily accommodate.
28

     (Id.)

**4**

On January 20, 2005, Plaintiff injured her right shoulder while attempting to move an obese patient on a gurney.  Plaintiff immediately sought medical treatment and submitted a workers' compensation claim.[7]  She also consulted a physician, Dr. R. Whitmore, who placed her on modified work duty.[8]

Plaintiff had a followup visit with Dr. Whitmore on January 27, 2005, at which point she was diagnosed with a right shoulder separation.  Dr. Whitmore also extended Plaintiff's modified work conditions (no use of right arm and sling requirement) and estimated a return to full duty in "four weeks."  Over the next few weeks, Dr. Whitmore lessened Plaintiff's work conditions based on improved mobility and strength.[9]

It is undisputed that Plaintiff submitted her medical notes to AMR indicating her diagnosis, medical limitations, and expected

_____

[7] In conjunction with her injury, Plaintiff submitted a "Employee Report of Industrial Injury" with AMR on January 20, 2005."

[8] According to Defendant, these restrictions precluded Plaintiff from performing any modified work at AMR and she was placed on workers' compensation leave.

[9] In particular, Dr. Whitmore imposed the following modified work conditions:

* Patient may have "minimal" use of right arm;

* Patient may use hand and arm about five minutes per hour provided it remain below chest height;

* Patient can lift up to five pounds with no pushing or pulling; and

* No climbing.

(Doc. 53-6.)

5

return to full-duty beginning in late January 2005.  Plaintiff
claims that when she submitted her first note on January 27, 2005,
she also requested AMR provide her with light duty work.
Specifically, Plaintiff states that on January 27, 2005, she spoke
with Randy Lopes and gave him the light duty release form.  Mr.
Lopes told Plaintiff that he did not have any light duty positions
currently available.

According to Plaintiff, she returned to AMR every week to
submit Dr. Whitmore's modified work conditions and to request light
duty work.  Plaintiff states that during these visits she spoke
with Terrie Allread, among others, to discuss light duty work.  It
is undisputed that light duty work was unavailable between January
2005 and June 2005.[10]

Plaintiff underwent right shoulder surgery in June 2005 and
she was unable to return to work until March 12, 2006.  On March
13, 2006, Plaintiff's medical provider approved her for modified
work.  Under the then-applicable work restrictions, Plaintiff could
lift no more than 25 pounds, was "limited" in her ability to push,
pull, and reach, and was not allowed repetitive use of her right
upper extremity.  These restrictions remained in place through

_____

[10] The scope of Plaintiff's visits to AMR offices and her
requests for light duty work between January 2005 and June 2005 is
heavily disputed.  Defendant maintains that Plaintiff discussed
light duty and other possible accommodations with a number of field
supervisors, supervisors, and risk management personnel. Plaintiff
admits she made efforts to discuss these matters with AMR
personnel, but insists she was "summarily told there was no work
for her or that AMR refused to discuss the matter with her."
According to Plaintiff, these discussions did not constitute
Defendant's active engagement in the interactive process under the
FEHA.

1   September 25, 2006, at which point her maximum weight was increased
2   to 35 pounds.

3        On March 3, 2006, Plaintiff met with Jared Bagwell to discuss
4   light-duty assignments or some other accommodations for her
5   disability.  Plaintiff states that during the meeting Mr. Bagwell
6   left the room to call Terrie Allred, AMR's then Risk Management
7   supervisor and current General Manager for Stanislaus and Tulare
8   Counties.  According to Plaintiff, Bagwell remained on the phone
9   several minutes.  When he returned, Bagwell told Plaintiff that
10  there was no light-duty work available.

11       In 2006, Plaintiff made several attempts to contact Cindy
12  Woolston, AMR's field operations director for Stanislaus County.
13  Plaintiff's first meeting with Woolston was limited to issues over
14  Plaintiff's medical coverage.  In May 2006, Plaintiff's legal
15  counsel sent a letter to Woolston demanding that AMR engage in the
16  "interactive process."  Woolston forwarded the letter to AMR's
17  attorney, but did not arrange a meeting with Plaintiff or her legal
18  counsel.  Woolston responded similarly to Plaintiff's August 2006
19  letter, which requested that AMR meet with Plaintiff to discuss
20  accommodations for her disabilities.[11]

21       In January 2007, Plaintiff and her husband, another AMR
22  employee, met with Union Steward Paul Angelo, field supervisor Mike
23  Hilton, and Wooston at AMR's Modesto office.  According to
24  Plaintiff, she asked Ms. Wooston if AMR would engage in the
25  interactive process and discuss reasonable accommodations for her

26

27       [11] Plaintiff asserts that she left several messages with AMR's
28  human resources department in late 2006, which were not returned.

**7**

disability.   Wooston responded that any discussions concerning Plaintiff's employment were to be handled by Plaintiff's and AMR's legal counsel.[12]

On February 21, 2007, Dr. Michael Purnell, Plaintiff's treating physician, sent Plaintiff's Workers' Compensation Representatives a letter entitled "Primary Treating Physician's Permanent and Stationary Report."   The letter summarized Plaintiff's work restrictions, including the 35 pound lifting requirement.   The letter also characterized Plaintiff's medical status as "permanent" for workers' compensation purposes.[13]

On April 23, 2008, Dr. Purnell prepared another letter describing Plaintiff's medical history and work limitations.[14]   Dr. Purnell stated that Plaintiff had been under his care for three years:

> During the time of her injury and rehabilitation she was unable to reach or lift with her dominant right upper extremity.   This resulted in her being unable to work because of the requirements for reaching and

---

[12] Wooston declares that she relayed Plaintiff's comments to AMR's legal counsel immediately following the meeting, which lasted approximately ten minutes.

[13] Dr. Purnell summarized Plaintiff's work restrictions as follows: "Based on the above symptomalogy the patient has restrictions of lifting of 35 pounds at the waist level.   She can only occasionally lift to shoulder level or above with less than 10 pounds.   Pushing, pulling and reaching are restricted to an occasional basis."   That future medical care "should be in the form of office evaluation, use of oral anti-inflammatories, injection therapy, or physical therapy, as well as diagnostic tests if she should experience an aggravation or flare-up of her condition."

[14] Although the letter lists the addressee as "To Whom it May Concern," it appears that the intended recipient is the agency or entity responsible for determining whether Plaintiff is eligible to receive medical and/or monetary benefits.

8

> lifting.  Her period of disability extended for two years.  For the first year she was unable to work at all and even the second year she could only work under limited circumstances.   She has not been able to return because of her persistent discomfort.

Plaintiff asserts that this letter was in anticipation of her application for Social Security benefits.

AMR maintains that none of Plaintiff's medical notes permitted her to return to work as a paramedic and no other positions were available within her restrictions and for which she was qualified. As a result, AMR placed Plaintiff on a lengthy leave of absence. AMR contends that Plaintiff is a current AMR employee, on inactive status, and was never terminated.  Plaintiff disputes this, arguing that she was terminated on March 3, 2006 when Mr. Bagwell told her that there were no light duty positions available.  Plaintiff also maintains that she can perform the functions of a paramedic, including moving patients to and from a gurney.

According to Cindy Woolston, between March 3, 2006 and the present, the only available positions AMR's Modesto facility were EMT and paramedic positions, as well as an Operations Manager position, which is a substantial promotion from a paramedic position.  It is undisputed that Plaintiff was not considered for positions outside of Stanislaus County.


C.   <u>Union Grievances</u>

On January 27, 2006, Plaintiff, via Union Steward Paul Angelo, filed a grievance under the terms of the CBA:

> Above named [Employee] was told her health benefits will no longer be provided by the [Employer]. [Employer] did not allow [Employee] to perform light-duty which pre-maturely put her on a Worker's

1        **Compensation Leave.**

2    **(Doc. 53-26.)**

3        **To resolve the matter, Plaintiff requested that AMR "extend**
4    **health benefits coverage until June 23rd when Employee was taken**
5    **off all light duty by her physician."  The grievance was resolved**
6    **when Plaintiff's medical benefits were extended for 120 days, the**
7    **maximum number of "light duty" days available to employees under**
8    **AMR's policy.[15]  The parties, however, dispute the scope and meaning**
9    **of the grievance.  Plaintiff argues the grievance was limited to**
10   **her claims for medical insurance, while Defendant maintains it**
11   **covered her medical insurance, as well as her dispute over the**
12   **availability of light duty work.**

13       **According to Plaintiff, she wanted a second grievance filed**
14   **against AMR concerning its non-accommodation of her request for**
15   **light duty work.  However, the Union did not pursue the grievance**
16   **so Plaintiff filed a complaint against the National Emergency**
17   **Medical Services Association ("NEMSA") with the National Labor**
18   **Relations Board.[16]  Plaintiff later withdrew the Complaint against**
19   **NEMSA.**

20   _____

21       [15] The Agreement/Settlement provided: "After review of the
     facts regarding extending benefits for 120 days due to the employee
22   Karen Scheller not being offered Light Duty.  American Medical
     Response offered during a Level I Grievance meeting held on March
23   16, 2006 to pay the cost of COBRA for 120 days starting from the
     date of loss of coverage."
24

25       [16] NEMSA is a registered labor union and not-for-profit mutual
     benefit corporation that specializes in the labor representation of
26   pre-hospital EMS Professionals such as EMTs, Paramedics,
     Dispatchers, Call Takers, Critical Care Nurses, Air Ambulance
27   Flight Nurses and Paramedics, as well as EMS related support staff.
     _See_ NEMSA website, "About," http://www.nemsausa.org/home_about.php
28   (last visited June 12, 2010).

                                    **10**

1    Prior to January 2006, Plaintiff had experience filing
2  grievances against AMR concerning accommodations provided to her as
3  a disabled employee.   In 2003, Plaintiff filed a grievance against
4  AMR following a 2001 knee injury.   Plaintiff alleged that AMR
5  failed to provide her "light duty work" for which she was medically
6  able to perform.   Plaintiff was eventually given light duty work
7  and the grievance was settled for $30,000.

8

9          D.   **Plaintiff's EEOC/DFEH Complaints**

10    On July 9, 2006, Plaintiff filed a complaint with the U.S.
11  Equal Employment Opportunity Commission in San Jose, California.
12  Plaintiff alleged in the complaint that she was discriminated
13  against based on her age, sex, and disability.   Plaintiff claimed
14  that "many other employees with greater limitations on light duty
15  have been accommodated by the employer" and that she was "verbally
16  abused by management."   Plaintiff listed four AMR employees who she
17  claimed were accommodated by AMR in the past.

18    On June 28, 2007, the Department of Fair Employment and
19  Housing ("DFEH") sent Plaintiff a letter outlining her claim
20  against AMR.   The DFEH stated that "the investigation did not
21  reveal sufficient evidence or information to establish that a
22  violation of the FEHA occurred."   Plaintiff was given fourteen days
23  to supplement or support her allegations, which she did.

24    On July 13, 2007, the Department of Fair Employment and
25  Housing sent Plaintiff a letter stating that it was "unable to
26  conclude that the information obtained establishes a violation of
27  the statute."   The letter served as Plaintiff's "right to sue"
28

                                11

notice.[17]

### E.   Age Discrimination Allegations

According to Plaintiff, several AMR employees made disparaging remarks to her concerning her age and use of the workers' compensation system.  First, Plaintiff states that in response to her request for light duty work in the spring of 2005, Terrie Allread told her that she should consider another line of work because she was getting "too old" and was "becoming a liability." Allread recalls speaking with Plaintiff in 2005, but denies making any disparaging statements concerning Plaintiff's age or work capabilities.

Plaintiff also alleges that sometime in late 2006 or early 2007 AMR Quality Assurance Manager Mike Corbin told her she was a "workers' compensation nightmare."  According to Plaintiff, this comment was made after she submitted her "modified work conditions" and requested light duty work.  Corbin is acquainted with Plaintiff, but denies he disparaged her in any manner.  Corbin states that he never told Plaintiff that "she was a workers' comp. Nightmare, even in a joking matter [...] it would be out of

---

[17] In addition to her July 2006 complaint, Plaintiff also filed a DFEH complaint against AMR in 2003.  In 2003, Plaintiff injured her right knee while working as a paramedic, causing her to miss work and, much like her 2005 injury, her primary care doctor imposed modified work conditions.  Plaintiff's 2003 complaint to the DFEH was based on AMR's refusals to being her back to work or offer her light work duty.  According to Plaintiff, the DFEH ruled in her favor and the dispute proceeded through the Union and the CBA's grievance procedures. Plaintiff states that she ultimately received a $30,000 settlement from AMR based on the 2003 complaint. She also alleges that she was assigned light duty work following her knee surgery.

1   character for me to make a statement like that."

2       Plaintiff also alleges that, sometime after her 2005 shoulder
3   injury, Cindy Wooston told Plaintiff she could "hire two first year
4   paramedics for what [Plaintiff] was paid."   Ms. Wooston denies
5   making this comment.

6

7                    III.   PROCEDURAL BACKGROUND

8       Plaintiff   filed   this   action   in   the   Superior   Court   of
9   California, County of Stanislaus, on February 20, 2008. The
10  operative First Amended Complaint ("FAC") asserts six causes of
11  action against AMR: (1) Disability Discrimination under FEHA; (2)
12  Age   Discrimination   under   FEHA;   (3)   Tortious   Termination   in
13  Violation   of   Public   Policy;   (4)   Retaliation;   (5)   Breach   of
14  Employment Contract; and (6) Breach of the Implied Covenant of Good
15  Faith and Fair Dealing.[18]  Plaintiff also seeks punitive damages.

16      On June 6, 2008, Defendant removed this case on the basis of
17  preemption by Section 301 of the Labor Relations Management Act.
18  (Doc. 1.)  On July 28, 2008, Plaintiff filed a motion to remand the
19  case back to the Stanislaus County Superior Court.   (Doc. 11.)
20  Plaintiff's motion was denied on September 15, 2008.   (Doc. 28.)

21      On October 20, 2009, Plaintiff filed a motion for summary
22  adjudication as to Plaintiff's disability discrimination claim
23  only.   (Doc. 43.)   Plaintiff argues that she has established a
24  prima facie case of discrimination and no triable issues of fact
25  remain as to: (1) AMR's refusal to engage in the interactive

26  ────────────────

27      [18] Plaintiff initially asserted a seventh cause of action for
    intentional   infliction   of   emotional   distress   against   Cindy
28  Woolston.  Ms. Woolston is no longer a party to this litigation.

                                13

process; and (2) ANR's failure to accommodate Plaintiff's disability.

On October 21, 2009, AMR moved for summary judgment or, in the alternative, summary adjudication on all six claims in Plaintiff's First Amended Complaint. Specifically, AMR argues that Plaintiff's discrimination fails because she could not perform the essential functions of her job, with or without a reasonable accommodation. AMR also asserts that Plaintiff was accommodated pursuant to her leave of absence and that AMR met its "interactive process" obligations.

Plaintiff filed her opposition to Defendant's summary judgment/adjudication motion on November 6, 2009. (Doc. 61.) In support of her opposition, Plaintiff submitted: (1) a Memorandum opposing Defendant's motion; (2) the declaration of Plaintiff Karen Scheller; (3) the declaration of Brett L. Dickerson; (4) a Statement of Undisputed Facts; and (5) a "Response to Defendant's Statement of Undisputed Facts." (Docs. 60, 62-64.)

Defendant filed its opposition to Plaintiff's summary judgment/adjudication motion on November 6, 2009. (Doc. 65.) In support of its opposition, Defendant submitted: (1) a Memorandum opposing Plaintiff's motion; (2) the declaration of Michael Corbin; (3) the declaration of Cindy Woolston; (4) the declaration of Bob Wattenbarger; (5) the declaration of Jennifer K. Achtert; (6) a "Response to Plaintiff's Statement of Undisputed Facts." (Docs. 65-71.)

Plaintiff and Defendant have filed replies and numerous evidentiary objections. (Docs. 75-82.)

14

1

### IV.   LEGAL STANDARD

2   Summary judgment/adjudication is appropriate when "the
3 pleadings, the discovery and disclosure materials on file, and any
4 affidavits show that there is no genuine issue as to any material
5 fact and that the movant is entitled to judgment as a matter of
6 law." Fed. R. Civ. P. 56(c).  The movant "always bears the initial
7 responsibility of informing the district court of the basis for its
8 motion, and identifying those portions of the pleadings,
9 depositions, answers to interrogatories, and admissions on file,
10 together with the affidavits, if any, which it believes demonstrate
11 the absence of a genuine issue of material fact." *Celotex Corp. v.*
12 *Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks
13 omitted).

14    Where the movant will have the burden of proof on an issue at
15 trial, it must "affirmatively demonstrate that no reasonable trier
16 of fact could find other than for the moving party." *Soremekun v.*
17 *Thrifty Payless*, Inc., 509 F.3d 978, 984 (9th Cir.2007).  With
18 respect to an issue as to which the non-moving party will have the
19 burden of proof, the movant "can prevail merely by pointing out
20 that there is an absence of evidence to support the nonmoving
21 party's case." *Soremekun*, 509 F.3d at 984.

22   When a motion for summary judgment is properly made and
23 supported, the non-movant cannot defeat the motion by resting upon
24 the allegations or denials of its own pleading, rather the
25 "non-moving party must set forth, by affidavit or as otherwise
26 provided in Rule 56, 'specific facts showing that there is a
27 genuine issue for trial.'" *Soremekun*, 509 F.3d at 984. (quoting
28 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "A

1  non-movant's bald assertions or a mere scintilla of evidence in his

2  favor are both insufficient to withstand summary judgment." *FTC v.*

3  *Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).   "[A] non-movant

4  must   show   a   genuine   issue   of   material   fact   by   presenting

5  *affirmative evidence* from which a jury could find in his favor."

6  *Id.* (emphasis in original). "[S]ummary judgment will not lie if [a]

7  dispute   about   a   material   fact   is   'genuine,'   that   is,   if   the

8  evidence is such that a reasonable jury could return a verdict for

9  the nonmoving party." *Anderson*, 477 U.S. at 248.   In determining

10 whether a genuine dispute exists, a district court does not make

11 credibility determinations; rather, the "evidence of the non-movant

12 is to be believed, and all justifiable inferences are to be drawn

13 in his favor."   *Id.* at 255.

14

15                              **V.   DISCUSSION**

16      **A.   FEHA Claims**

17      Plaintiff's allegations encompass three distinct but factually

18 overlapping causes of action under the FEHA.[19]   First, Plaintiff

19 argues   that   she   was   discriminated   against   based   on   her   injury

20 because she was placed on medical leave/terminated when she could

21 in fact perform as a paramedic.[20]   Second, Plaintiff alleges that

22

23      [19] The FEHA prohibits certain specified employment practices,
   including discriminating against an employee based on a physical
24 disability (subd. (a)); failing to make a reasonable accommodation
   for an employee's disability (subd. (m)); and failing to engage in
25 a timely, good faith, interactive process with an employee to
   determine whether there is any way to accommodate reasonably the
26 employee's disability (subd. (n)).

27

28      [20] The parties dispute whether Plaintiff was terminated or is
   properly characterized as "on leave."   Plaintiff's employment

                              **16**

AMR violated FEHA by failing to provide her with a reasonable accommodation. The third FEHA claim is that AMR failed to engage in the interactive process as required by Cal. Gov't Code § 12940(n). The seminal dispute in this case is whether Plaintiff was unable to perform her essential duties even with reasonable accommodations, which, if established, forecloses Plaintiff's claims under the FEHA.

AMR seeks to summarily adjudicate each of Plaintiff's claims under the California Fair Employment and Housing Act ("FEHA"). The substance of AMR's motion is that Plaintiff cannot establish a prima facie case because she was unqualified to perform as a paramedic after the industrial injury, even with reasonable accommodation. AMR further asserts that it satisfied its duty to accommodate by providing Plaintiff with a lengthy leave of absence, and that it engaged in the interactive process but no accommodation was available considering Plaintiff's significant medical limitations.

Plaintiff cross-moves for summary judgment on the latter two FEHA claims. According to Plaintiff, she established a prima facie case of discrimination and no triable issues of fact remain as to AMR's failure to accommodate Plaintiff's disability and its refusal

---

status was the subject of supplemental briefing following oral argument. In her supplemental briefing, Plaintiff contended she was terminated from AMR in March 2006. AMR responded that Plaintiff is still an employee on "medical leave." However, the evidence demonstrates that Plaintiff is not receiving any monetary compensation or benefits, even if she is still technically "employed" by AMR. The proper characterization of this relationship is unclear and must be determined by the trier of fact along with the seminal issue in this case, whether Plaintiff was bilaterally restricted.

to engage in the interactive process.

### 1.   *Disability Discrimination*

Plaintiff claims that AMR's act of placing her on medical leave constructively terminated her and constituted disability discrimination in violation of the FEHA.   To prove disability discrimination, plaintiff must demonstrate that defendant "impermissibly discriminated because plaintiff was able to do the job with or without reasonable accommodation."[21]   *Green v. State of*

---

[21] FEHA proscribes two types of disability discrimination: (1) discrimination arising from an employer's intentionally discriminatory act against an employee because of his or her disability (disparate treatment discrimination); and (2) discrimination resulting from an employer's facially neutral practice or policy that has a disproportionate effect on employees suffering from a disability (disparate impact discrimination). See *Knight v. Hayward Unified School Dist.*, 132 Cal. App. 4th 121, 128-29 (2005).   In this case, Plaintiff alleges only disparate treatment discrimination in that she was not reinstated to her paramedic position following her shoulder injury.

Discriminatory intent is an essential element of a FEHA action alleging disparate treatment based on disability, whether actual or perceived. *See Green v. State of California*, 42 Cal.4th 254, 262 (2007).   Because direct evidence of discriminatory intent is rare, California has adopted the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) for trying discrimination claims based on a theory of disparate treatment when direct evidence of discriminatory intent is absent. *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 354-55 (2000). Under this three-part analysis, the initial burden is on the plaintiff to establish a prima facie case of discrimination.   *Id*. at 354.

To establish disability discrimination, a Plaintiff must provide evidence that: (1) he or she suffered from a disability or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, i.e., she was "qualified for the position"; and (3) was subjected to an adverse employment action because of the

*Calif.*, 42 Cal.4th 254 (2007).  Under the FEHA, it is plaintiff's initial burden to demonstrate that "he or she is a qualified individual under the FEHA (i.e., that he or she can perform the essential functions of the job with or without reasonable accommodation)."  *Id.* at 121.  Disability discrimination cannot be shown if the plaintiff was "unable to perform [...] her essential duties even with reasonable accommodations, or [could not] perform those duties in a manner that would not endanger [...] her health or safety or the health or safety of others even with reasonable accommodations."  Cal. Gov't Code § 12940(a)(1).

The essential functions of a job are "the fundamental [...] duties of the employment position the individual with a disability holds or desires," not including "the marginal functions of the position."  Cal. Gov't Code § 12926(f); see also 2 Cal. Code Regs § 7293.8(g) (an "essential job function" is a job duty that is fundamental to the position, as opposed to marginal or peripheral). An employer's job description is considered to be the most reliable evidence of what a particular job's essential functions are.  *See Dark v. Curry County*, 451 F.3d 1078, 1087 (9th Cir. 2006)

disability or perceived disability. *Brundage v. Hahn*, 57 Cal. App. 4th 228, 236 (1997); *see also Green*, 42 Cal.4th at 261 (Plaintiff bears burden as part of prima facie case to show he or she could perform essential duties with or without accommodation).

Defendant does not argue that Plaintiff was not "disabled" within the meaning of FEHA. Rather, AMR argues that Plaintiff cannot establish a prima facie case because she cannot demonstrate she was "qualified" as a paramedic following her January 20, 2005 shoulder injury.  Section 12940(a), which prohibits discrimination based on an employee's physical disability, "specifically limits the reach of that proscription, excluding from coverage those persons who are not qualified, even with reasonable accommodation, to perform essential job duties." *Green*, 42 Cal.4th at 262

(interpreting the federal Americans With Disabilities Act). However, other relevant evidence that may be considered in determining the essential functions of a job include the actual work experience of current or past employees in the job, the amount of time spent performing a function, and the consequences of not requiring that an employee perform a function.  Cal. Gov't Code § 12926(f)(2);  2 Cal. Code Regs § 7293.8(g)(2).

The substance of AMR's motion is that Plaintiff was functionally unqualified to perform her job, with or without reasonable accommodation.  AMR relies on two facts to support this assertion: (1) Plaintiff was unqualified to perform her position because she was not able to lift 120 pounds, the minimum lifting requirement for AMR paramedics at the time of her injury; and (2) Plaintiff's "permanent" medical restrictions limited her to lifting 35 pounds bilaterally.  AMR claims that these two factors, taken together, establish that Plaintiff cannot prove a prima facie case of disability discrimination under the FEHA.

AMR first contends that it is undisputed that one of the essential functions of a paramedic is the ability to lift and move patients.  In connection with this function, AMR asserts that it requires its paramedics to lift a minimum of 120 pounds, and claims that Plaintiff was (and is) not a "qualified individual" because Plaintiff's permanent and stationary restrictions limit her to lifting 35 pounds bilaterally.  AMR points out that immediately following her injury in early 2005, Plaintiff's right arm was immobilized and non-functional.  Although Plaintiff's medical condition improved, her "permanent and stationary" medical limitations provide that she cannot lift more than 35 pounds.

1    According to AMR, both the written job description of the
2 paramedic position and Ms. Woolston's declaration demonstrate that
3 AMR requires its paramedics to lift a minimum of 120 pounds.   In
4 particular, the Position Description for Paramedics requires
5 paramedics to "lift and move patients as required to provide optimum
6 care," as well as perform a number of physically-intensive
7 activities, including kneeling, stooping, bending, leaning, and
8 stopping.   (Doc. 53-3.)   Although the "Position Description" does
9 not specifically include a minimum weight requirement, Ms. Woolston,
10 AMR's general manager for Stanislaus and Tulare Counties, declares
11 that "AMR requires its paramedics to be able to lift a minimum of
12 120 pounds."   (Doc. 53, ¶ 5.)

13    According to AMR, Plaintiff acknowledged this 120 pound
14 requirement during her August 22, 2006 deposition.   Specifically,
15 at her August 22, 2006 workers' compensation deposition, Plaintiff
16 stated that she "was not able to lift the amount of weight required
17 by [her] job":

18    Q:   With your current limitations, do you feel that
19         you're able to do the job as a paramedic at AMR?

     A:   No.
20
21    Q:   In what way do you feel you're not able to do the
          job as a paramedic?

22    A:   I'm not able to lift the amount of weight required
23         by my job.

24    Q:   And how many pounds are you required to lift?

     A:   120.
25
26    Q:   Is there a pre-employment physical that a paramedic
          has to go through to be able to lift 120 pounds
27         before they're hired?

28    A:   At the time I was hired in 1996, yes.   I cannot
          speak to today.

21

1

2   **(Pl. Dep., August 22, 2006, 42:18-43:6.)**

3      **Plaintiff rejoins that a factual dispute exists regarding how**

4   **much weight paramedics must lift.  Plaintiff concedes that "moving**

5   **and lifting" patients is an essential function of the job, however,**

6   **she contends that the lifting requirement was not a part of the job**

7   **description at the time of her injury in January 2005.  To support**

8   **this argument, Plaintiff points to the absence of any "minimum**

9   **weight requirement" in Defendant's "Position Description" and her**

10  **confusion during her deposition on August 22, 2006.**

11     **With respect to her August 22, 2006 statements, Plaintiff**

12  **argues that her deposition testimony "relates back to her**

13  **understanding at the time she was originally hired in or about**

14  **1996":**

15          In [the 2006] deposition I referenced my understanding
            that there had been a requirement that paramedics be
16          able to lift 120 pounds at the time I was hired by
            AMR.  Since 1996, I have never been informed of any
17          such lifting requirement, nor am I aware of any such
            minimum lifting requirement in the Paramedic Job
18          Description.

19
    **(Doc. 63, ¶ 5.)**
20
       **Plaintiff's arguments concerning her understanding of**
21
    **Defendant's minimum lifting requirement are inconsistent.  Plaintiff**
22
    **testified, under oath, that she was unfit for her job as a paramedic**
23
    **because she could not "lift the amount of weight required," which**
24
    **she later testified was 120 pounds.  Plaintiff's subsequent**
25
    **declaration does not change the fact that on August 22, 2006, she**
26
    **understood that Defendant had a 120-pound lifting requirement for**
27
    **paramedics, a requirement which she understood to render her unfit**
28

                                    22

to perform as a paramedic.   Defendant adequately established the fundamental job responsibilities of a paramedic included lifting and moving patients, as well as the capacity to lift 120 pounds. Plaintiff failed to refute this.

AMR next argues that "Plaintiff was simply not qualified to perform her position after her January 20, 2005 injury" because her "permanent and stationary restrictions limit[ed] her to lifting 35 pounds bilaterally."   To support this contention, Defendant points to Dr. Purnell's February 21, 2007 letter describing Plaintiff's medical limitations as "permanent" and Plaintiff's August 22, 2006 deposition testimony, where she "assumed" that she was limited to lifting 35 pounds *bilaterally*:

> Q:   At the current time, Dr. Purnell has the restrictions placed on the no lifting more than 25 pounds, no pushing and pulling and work above the shoulder level.   Do you feel that you're able to lift 25 pounds at this time?
>
> A:   Yes.
>
> Q:   How many pounds do you feel that you are physically able to lift?
>
> A:   Approximately 35.
>
> Q:   Would that just be the right or bilaterally?
>
> A:   I'm assuming bilaterally.

(Pl.'s Dep., 36:8-36:25.)

Plaintiff does not dispute that Dr. Purnell characterized her right shoulder injury as "permanent" for workers' compensation purposes, however, she disputes that she was ever limited to lifting 35 pounds bilaterally.   According to her declaration, which is attached to her opposition to AMR's motion, Plaintiff did not understand the proper medical definition of bilateral:

1
2
3
4
5

> **I was questioned regarding a "bilateral" 35 pound lifting restriction. There was apparently some confusion between myself and the deposing attorney as to the meaning of bilateral. I have never received any treatment or evaluation as to my capabilities with my left arm, nor have I been subject to a lifting restriction as to my left arm. During all time periods relevant to this matter, I have been able to easily lift more than 35 pound[s] with my left hand.**

6
7

(Doc. 63 at ¶ 6.)

8
9

     AMR responds that Plaintiff has still offered nothing to

10

counter the evidence it submitted to support its motion, i.e., Dr.

11

Purnell's letter established the injury as "permanent" and Plaintiff

12

herself acknowledged a "bilateral" limitation.  AMR also objects to

13

Plaintiff's declaration on grounds that it is "self-serving" and

14

"flatly contradicts both her prior sworn statements and the medical

15

evidence."  AMR cites *Cleveland v. Policy Management Systems Corp*,

16

526 U.S. 795 (1999) and *Kennedy v. Applause, Inc., 90 F.3d 1*477 (9th

17

Cir. 1996) to support its arguments.  In this Circuit, a party

18

cannot create an issue of material fact by providing a self-serving

19

declaration which contradicts that party's earlier deposition

20

testimony necessitating a choice between the nonmoving party's two

conflicting versions.  *See, e.g., Radobenko v. Automated Equipment*

21

*Corp.*, 520 F.2d 540 (9th Cir. 1975).

22

     Despite AMR's objections, Plaintiff's sworn statements

23

concerning her medical condition and restrictions are not excluded

24

as they are not wholly inconsistent.  In *Messick v. Horizon Indus.*

25

*Inc*, 62 F.3d 1227, 1231 (9th Cir. 1995), the Ninth Circuit recited

26

the general rule of exclusion, but provided that "the non-moving

27

party is not precluded from elaborating upon, explaining or

28

clarifying prior testimony elicited by opposing counsel on

deposition; minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit."[22]   Here, a review of the Plaintiff's deposition transcript shows that her claims that she did not clearly comprehend the meaning of "bilateral" is supported by the lack of an explanation by the questioner at the deposition as to the technical meaning of the term "bilateral."   Her claimed lack of understanding concerning this medical term of art is further corroborated by the medical letters and notes of Dr. Whitmore and Dr. Purnell, who both diagnosed Plaintiff with a "right shoulder injury" and only restricted right arm and shoulder rotational movements.   (See Docs. 53-4 through 53-25, Plaintiff's "Work Status Reports"; K. Scheller's April 9, 2009 Dep., Exh. 12, Dr. Purnell's "Permanent and Stationary Report" (discussing Plaintiff's "right shoulder injury"); K. Scheller's April 9, 2009 Dep. Exh. 22, Dr. Purnell's letter ("During the time of her injury and rehabilitation she was unable to reach or lift her dominant right upper extremity."))   There is no mention of "bilateral" or her left arm in any of the medical documents submitted in connection with the cross-

_____

[22] As a general rule, an affidavit submitted in response to a motion for summary judgment which contradicts earlier sworn testimony without explanation of the difference does not automatically create a genuine issue of material fact. *Scamihorn v. General Truck Drivers*, 282 F.3d 1078, 1085 fn. 7 (9th Cir. 2002) (citing *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)).   To exclude such evidence, the district court first "must make a factual determination that the contradiction was actually a 'sham.'"   *Kennedy*, 952 F.2d at 267.   Plaintiff has submitted evidence to create a triable issue as to whether, following her surgery and clearance in 2006, her medical practitioner imposed a 35-pound bilateral weight restriction or whether she had the ability to lift more weight.

motions.[23]

Applying the FEHA framework to the facts of this case, there is a factual dispute as to the extent to which Plaintiff was subject to a bilateral weight restriction following her industrial injury, which precludes granting summary adjudication in favor of AMR. Here, there are two conflicting interpretations on whether Plaintiff was bilaterally-restricted and, if so, whether she could perform as a paramedic. She says she could. If Plaintiff is to be believed, only her right arm was restricted and she was capable of performing her paramedic duties with her left, non-dominant arm (using her right arm for support up to 35 pounds). AMR rejoins that Plaintiff was limited to lifting 35 pounds bilaterally, in both arms combined, necessarily imposing on her ability to satisfy the 120 pound minimum requirement. This disputed issue of fact cannot be resolved as a matter of law.

A similar argument to AMR's was rejected in *Siraj v. Bayer Healthcare LLC*, No.09-00233-SI, 2010 WL 889996 (N.D. Cal. Mar. 8, 2010). There, as here, defendant moved for summary adjudication on grounds that the essential job responsibilities were clearly defined and plaintiff was unable to fulfill those duties based on her medical restrictions. In *Siraj*, plaintiff's injuries were considered "permanent," she was limited to lifting five pounds in her right extremity, and was restricted from cable-tying for longer

---

[23] Besides Plaintiff's "bilateral" medical conclusory statement, there is no evidence that Plaintiff's left arm was immobilized or otherwise impacted by her January 2005 industrial injury.

than 2 minutes and pipetting for longer than twenty minutes.[24]   At issue was whether plaintiff could offer testimony to show that she could perform duties that required her to lift objects weighing greater than ten pounds.   The *Siraj* court stated:

> Defendant asserts that because the restrictions rendered plaintiff unable to lift more than five pounds with the unassisted right hand, she would be unable to lift more than ten pounds using both hands.   The Court does not agree with defendant's logic. While it is certainly possible to pick up a ten pound object using each hand equally, it is also possible to pick up that object using one hand, or using primarily one hand and the other to balance.   Malmuth said that plaintiff was able to lift, within her restrictions, items that ranged in weight from 3.35 to 12.35 kilograms (7.4 to 27.2 pounds).   Malmuth Report, Docket No. 46, Ex. D at 60. If lifting items in that range was an essential function of plaintiff's job, there is a triable issue of fact as to whether plaintiff could lift them without violating her medical restrictions.

*Id*. at 12. (citations omitted).

This language applies with equal force to the facts of this case.

There is additional evidence supporting the existence of a disputed issue of material fact whether Plaintiff has established a prima facie case of disability discrimination.   The FEHA requires a

---

[24] The *Siraj* court noted that the employer requested a more specific description of the employee's medical limitations, which was not done in this case.   Specifically, in May 2008, defendant in *Siraj* asked for and received a written account of Plaintiff's restrictions, which included: "(1) no cable-tying for longer than 2 minutes continuously, followed by a minimum of 5 minutes rest and/or alternate work activities, (2) no pipetting for longer than 20 minutes continuously, followed by a minimum of 30 minutes of rest and/or alternate work activities, (3) no lifting more than 5 pounds with the unassisted right hand, (4) no repetitive use of the right hand for greater than 20 minutes continuously, followed by a minimum of 30 minutes of rest and/or alternate work activities." *Siraj v. Bayer Healthcare LLC*, 2010 WL 889996 at 2.

determination of whether Plaintiff could perform the essential functions of the employment position held or desired, *with or without reasonable accommodation*. *See Green v. State*, 42 Cal.4th at 265-66 (emphasis added).   Plaintiff points to two accommodations that, if provided to her, would have enabled her to perform as a paramedic notwithstanding her shoulder injury.   The first, the "Lift Assist Policy," is designed to assist field personnel in lifting objects in the field.   The second, automatic gurneys, allow paramedics with limited lifting capabilities to move patients.   Both are available to Defendant's paramedic-employees and are permissible accommodations under the FEHA.   *See* Cal. Gov't Code § 12926(n).   The purpose of AMR's "Lift Assist Policy" is to "provide a "structured approach that effectively addresses the use of lift assists as a method to reduce the risk of personal injury or patient mishap in the field."   This policy applies to "all employees" and states that "requesting or utilizing additional individuals to help AMR employees lift or move a patient is an effective way to reduce the risk of personal injury and patient mishap."   Lift assists are mandatory if a patient's weight is "estimated to be in excess of 300 pounds" or "the patient's weight, position or other circumstance may involve lifting/movement loads that exceed an employee's perception of their own safe capability."

The second accommodation, the automatic gurney, can be raised and lowered hydraulically, but still requires two paramedics to carry the device and to load and unload the patient.   (Doc. 70, ¶ 3.)   The automatic gurney also weighs 125 pounds, approximately 30 pounds more than the traditional gurney, and has an unassisted lift capacity of 500 pounds.   (Id.)   However, Defendant argues that the

28

automatic gurney is not a possible accommodation because Plaintiff's medical limitations - specifically, the 35-pound bilateral weight limitation - prevent her from carrying the gurney from the ambulance to patient's location." As explained above, Plaintiff's evidence calls this assertion into question.

Further, it is undisputed that AMR previously accommodated a field paramedic who only has one arm and, as of early 2010, the individual is employed as a paramedic at AMR. AMR argues that this paramedic is not similarly situated because he his remaining arm is fully-functional, i.e., he is not bilaterally limited. Plaintiff disputes this characterization. She also rejoins that AMR should have conducted a "fit for duty test," which was employed by AMR when she was hired in 1996. Defendant responds that "fit for duty" tests were not included as part of the 2004 collective bargaining agreement and, as such, are not allowed.

Here, a physical disability significantly imposed on the essential requirements of plaintiff's job. AMR has adequately shown that it requires its paramedics to push, move, and transport individuals of varying weights who have serious medical injuries or illnesses. It has also demonstrated that AMR paramedics are expected to perform a number of physically-intensive activities and that AMR paramedics must be able to lift a minimum of 120 pounds.

However, the existing factual dispute over whether Plaintiff's limitations were bilateral or limited to her right arm prevent a finding that Plaintiff was not qualified to perform as a paramedic as of the date she attempted to return to work in 2006. There are also questions concerning whether Plaintiff could perform as a paramedic if provided one of the accommodations described above. On

29

the present record, there is a triable issue of fact as to whether plaintiff established a prima facie case of disability discrimination under the FEHA.  The amount of weight that Plaintiff could actually lift after her shoulder injury cannot be determined as a matter of law.  Defendant AMR's motion on this issue is DENIED.

2.   *Failure to Accommodate and Failure to Engage in the Interactive Process*

Both parties move for summary adjudication on Plaintiff's claim that AMR failed to reasonably accommodate her disability.  Under the FEHA, it is an unlawful employment practice for an employer to "fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee."  Cal. Gov't Code § 12940(m).   A "reasonable accommodation" includes "[j]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  Cal. Gov't Code § 12926(n)(2);  Cal. Code Regs tit. 2, § 7293.9(a)(2).

AMR first argues that it satisfied its duty to accommodate by providing Plaintiff with a lengthy - and continuing - leave of absence.  AMR further contends that the accommodations suggested by Plaintiff - to transfer Plaintiff to a paramedic position with "lower call-volume" or reassign her to a job in the billing or coding office - were unreasonable, as lifting and moving patients

30

1 was still an essential function of the paramedic job, which she
2 could not perform due to her medical restrictions.   As to
3 Plaintiff's request for an administrative or clerical position, AMR
4 claims that there were no positions available.

5     Plaintiff initially responds that AMR could have offered her
6 light duty work as a form of reasonable accommodation after
7 Plaintiff first informed her supervisors of her injuries in 2005.
8 In support, Plaintiff claims that she was given light duty work as
9 an "accommodation" in 2003 following a workplace knee injury.
10 Plaintiff claims that AMR refused, without explanation, to offer her
11 light duty work in 2005 and therefore it failed to reasonably
12 accommodate her disability.

13     Plaintiff's first argument is without merit.   The record
14 reveals that Plaintiff was not granted light duty work because there
15 were no light duty positions available.[25]  The declaration of Cindy
16 Woolston, General Manager of AMR's Stanislaus and Tulare County
17 operations, demonstrates that the only open positions in 2005 onward
18 were EMT and paramedic positions.[26]   AMR was only obligated to
19 reassign Plaintiff to another position within the company if there
20 was an existing, vacant position for which Plaintiff was qualified.

21

22     [25] The argument that AMR was required to permanently assign
Plaintiff light duty work is not accurate.  *See Raine v. City of*
23 *Burbank*, 135 Cal. App. 4th 1215, 1224 (2006) ("[A]n employer has no
duty ... to accommodate a disabled employee by making a temporary
24 accommodation permanent if doing so would require the employer to
create a new position justfor the employee.").
25

26     [26] Ms. Woolston also declares that an "Operations Manager"
position was available, but such a position is substantial
27 promotion from a paramedic position and is not a reasonable
accommodation under the FEHA.  *See, e.g., Watkins v. Ameripride*
28 *Services,* 375 F.3d 821, 828 (9th Cir. 2004).

1 *See Hanson*, 74 Cal. App. 4th 215, 227 (1999). **Plaintiff offers no**
2 **evidence to support her position, i.e., that light duty positions**
3 **were available following her injury in 2005. It is well-established**
4 **that Defendant was not required to create a new position to**
5 **accommodate Plaintiff.** *See McCullah v. S. Cal. Gas Co.*, 82 Cal.
6 **App. 4th 495, 501 (2000).**

7 **Plaintiff's "light duty" arguments are flawed for another**
8 **reason, namely that AMR's obligation to offer light duty work to its**
9 **employees expired 120 days after the injury date. Under the**
10 **Transitional Work Assignment Policy, which is part of the CBA,**
11 **"eligible employees may be offered transitional work assignments**
12 **during a 120 calendar day period, which begins on the date of**
13 **injury/illness."[27] Here, it is undisputed that no light duty**
14 **positions existed from the date of Plaintiff's injury until June**
15 **2005, when she underwent corrective surgery. By the time Plaintiff**
16 **was given her medical release on March 12, 2006, more than thirteen**
17 **months after her injury, the light duty option was not available.**

18 **Plaintiff's remaining arguments focus on her hostility toward**
19 **the "extended leave of absence" and her claims that she was (and is)**
20 **capable of performing her paramedic duties. For instance, Plaintiff**
21 **argues that she could perform all of her conventional job duties in**
22 **mid-2006, a few months post-surgery. AMR disputes that Plaintiff**
23 **could perform the "essential functions of her job" based on her 35-**
24 **pound bilateral restriction. On this point, the differences between**
25 **the two parties again relate to the factual dispute whether**

26

27
28 [27] The Policy also provides that the provision of transitional work hours is "always at AMR's discretion."

**32**

1  plaintiff was able to perform the essential functions of her job
2  within the medical restrictions.

3      The substance of AMR's argument is that it provided Plaintiff
4  with an extended leave of absence, thereby satisfying its duty to
5  "reasonably accommodate" a disabled employee under the FEHA.
6  Although Courts have held that reasonable accommodations can include
7  providing the employee "accrued paid leave" or "additional unpaid
8  leave," those are different cases.  *See Hanson*, 74 Cal. App. 4th at
9  226 ("*in appropriate circumstances*, reasonable accommodation can
10 include providing the employee accrued paid leave or additional
11 unpaid leave []") (emphasis added).  As explained above, there is a
12 triable issue of fact concerning the amount of weight that Plaintiff
13 could actually lift after her shoulder surgery.  According to
14 Plaintiff, she was not bilaterally restricted and was capable of
15 performing her paramedic duties.  At a minimum, Plaintiff claims
16 that she could function as a paramedic with assistance from the
17 automatic gurney, the lift assist policy, or stabilizing hook
18 provided to other disabled employees, which all qualify as §
19 12926(n)(2) accommodations.  Trial is necessary to resolve these
20 factual issues.  The cross-motions for summary adjudication are
21 DENIED with respect to Plaintiff's claim for failure to accommodate
22 her disability.

23     Both parties also move for summary judgment on Plaintiff's
24 claim that AMR failed to engage in the interactive process.  Under
25 the FEHA, it is unlawful for an employer "to fail to engage in a
26 timely, good faith, interactive process with the employee or
27 applicant to determine effective reasonable accommodations, if any,
28 in response to a request for reasonable accommodation by an employee

or applicant with a known physical or mental disability or known medical condition." Cal. Gov't Code § 12940(n). "I[t] is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." *Spitzer v. Good Guys, Inc.*, 80 Cal. App. 4th 1376, 1384 (2000) (internal quotation marks omitted).

*Nadaf-Rahrov v. Neiman Marcus Group, Inc.*, 166 Cal. App. 4th 952 (2008) is instructive:

> [T]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees with the goal of identify[ing] an accommodation that allows the employee to perform the job effectively .... [F]or the process to work [b]oth sides must communicate directly, exchange essential information and neither side can delay or obstruct the process. When a claim is brought for failure to reasonably accommodate the claimant's disability, the trial court's ultimate obligation is to isolate the cause of the breakdown ... and then assign responsibility so that [l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown.

*Id.* at 985 (internal citations and quotation marks omitted). To succeed on an interactive process claim, the employee must show that a reasonable accommodation was available. *Id.* at 985.

AMR avers that it is entitled to summary adjudication on Plaintiff's interactive process claim because the evidence shows that "there was simply no accommodation available for Plaintiff's significant limitations other than the lengthy leave that was provided to her." Defendant further contends that Plaintiff discussed possible accommodations with AMR field supervisors and human resources and risk management personnel for over a year, but Plaintiff "confus[es] the failure to provide an accommodation that

34

she liked with the failure to engage in the interactive process."
According to Defendant, Plaintiff cannot present a triable issue of
material fact on the issue of whether a reasonable accommodation was
available to her, other than the leave of absence she received.

Plaintiff responds that AMR's process was not interactive
because the company never involved Plaintiff in determining an
effective accommodation.   Plaintiff supports her position with
several facts, including:  she regularly met with AMR employees to
request light duty work or some other accommodations following her
injury, but each time she was sent home and told there was no light
duty work available or to contact AMR's legal counsel.   Plaintiff
also claims that AMR supervisors and management made no effort to
discuss an accommodation with her, other than a leave of absence.
She describes the leave of absence as an "across the board
accommodation [made] without even talking to the disabled employee."

The dispute between the two parties on the "interactive
process" claim turns on whether Plaintiff was subject to a 35-pound
bilateral restriction.   Summary adjudication is not appropriate.
Whether the interactions described by the parties constitute a
failure "to engage in a timely, good faith, interactive process with
the employee" cannot be determined as a matter of law.   The cross-
motions are DENIED.

B.   Age Discrimination under FEHA (Claim II)

Plaintiff's second claim for relief alleges that AMR unlawfully
discriminated against her based on age.   AMR moves to summarily
adjudicate this claim on grounds that there is insufficient evidence
to create a triable issue of fact.

35

California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination under FEHA.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  Under this test, plaintiff must first present a prima facie case.  If plaintiff makes a prima facie showing, a presumption of discrimination arises, requiring the employer to come forward with evidence "that its action was taken for a legitimate, nondiscriminatory reason." *Guz v. Bechtel Nat., Inc.*, 24 Cal.4th 317, 355-56 (2000).  "If the employer sustains this burden, the presumption of discrimination disappears.  The plaintiff must then have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive."   *Id*. at 356, (citations omitted).

To present a prima facie case of age discrimination under FEHA, Plaintiff must show that she is:  1) over 40 years of age; 2) performing competently in her position; 3) suffered an adverse employment action; and 4) some other circumstance suggests discriminatory motive. *See, e.g., Guz v. Bechtel Nat., Inc.,* 24 Cal. 4th at 355.

The parties do not dispute that Plaintiff has established the first and second elements of a prima facie case for age discrimination.[28]   AMR, however, challenges the sufficiency of the

---

[28] First, because Plaintiff was at least forty years of age during the events giving rise to this litigation, she was a protected-class member under FEHA. *See* Cal. Gov't Code § 12940(a). The parties also do not dispute that Plaintiff performed competently as a part and full-time paramedic from 1996 until the date of her injury in 2005.

36

evidence for the third and fourth factors required for a prima facie showing.    In particular, Defendant argues that Plaintiff's age discrimination claim fails because there is no evidence that she was subjected to an adverse employment action or circumstances "suggesting a discriminatory motive."

To establish discriminatory intent, the fourth prima facie element, Plaintiff asserts that Ms. Allread told her that she was "too old to be a paramedic and should consider another line of work." Plaintiff also alleges that Ms. Woolston told Plaintiff that "she could hire two first-year paramedics for what she was paying Plaintiff." According to Plaintiff, "the comments made by both Allread and Woolston represent compelling evidence that impermissible considerations as to Plaintiff's age played a role in AMR's refusal to bring Plaintiff back to work."

AMR rejoins that Allread and Woolston have both filed sworn declarations denying making these statements.    Even assuming the statements were made, AMR asserts that "the alleged statements would be nothing more than stray remarks, insufficient to support a discrimination claim or survive summary judgment."    AMR characterizes Plaintiff's arguments as "absurd circular reasoning," lacking a discriminatory nexus: "[Plaintiff's] circular reasoning is absurd [] Plaintiff asserts that because the allegedly-discriminatory remarks were (allegedly) made, she knows that the refusal to return her to work was discriminatory - and that she knows the remarks were discriminatory because AMR never allowed her to return to work."

Assuming, *arguendo*, that Plaintiff was terminated by AMR, which is contested, she has not presented any evidence to support a

discriminatory animus.   The record makes clear that neither Allread nor Woolston's statements played a role in her alleged termination. First, Plaintiff alleges Allread made her comments in early 2005, more than one year before Plaintiff claims she was allegedly terminated, negating any temporal nexus.   Further, Allread's declaration demonstrates that she "had no authority to make decisions about the termination of [Plaintiff's] employment." (Doc. 52, ¶ 6.) Plaintiff does not dispute this fact.

As to Woolston's alleged comments, they lack a discriminatory meaning.   However, assuming that higher wages are inextricably tied with advancing age, Plaintiff's April 9, 2009 deposition testimony reveals that she did not believe that Woolston's statements were discriminatory:

> **Q:**   Do you believe that Cindy Woolston had any role in any decision to terminate your employment with AMR, if it was indeed terminated?
>
> **A:**   That's a difficult question to answer.   I don't know that I can answer that [...] I'm just going to be honest and tell the truth.   I don't think it was anything personal against me.   I think it was simply a matter of AMR's policy or their unwritten policy.   I don't know [...]
>
> **Q:**   Do you believe that Cindy Woolston had anything to do with formulating the unwritten policy that you believe exists that employees who are 40 or over with a couple of work injuries were terminated?
>
> **A:**   I would like to think not.
>
> **Q:**   Do you have any reason to believe she was involved in that?
>
> **A:**   I don't have any direct evidence.

(Dep. Scheller (II), 124:15-125:1, 127:8-127:15.)   Nor was any of this evidence identified.

The alleged comments from Woolston and Allread, made a year

prior to her alleged termination, with no apparent or evident connection to any other adverse employment decision, are stray remarks that do not give rise to an inference that age animus negatively impacted Plaintiff's employment as a paramedic at AMR. Such a conclusion is consistent with the Ninth Circuit's "stray remark" jurisprudence. *See Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (recognizing that "stray" remarks are insufficient to raise an inference of discrimination and concluding that a comment by the decision-maker that he selected a candidate for a promotion because the candidate was a "bright, intelligent, knowledgeable young man" was a stray remark that did not raise an inference of age discrimination); *Peters v. Shamrock Foods Co.*, 262 F. App'x 30, 32 (9th Cir. 2007) (concluding that a "mom" comment was a stray remark, stating "a single comment related to a separate employment action made two years prior to [the plaintiff's] nonselection for the Food Service Sales Manager position is not direct evidence of [gender] discrimination."); *Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (concluding that a superior's comment, not tied directly to the adverse employment decision, that "[w]e don't necessarily like grey hair" did not support an inference of age discrimination).

Because Plaintiff presents no other evidence suggesting that her age played any role in the decision to terminate or take any adverse action against her, AMR's motion for summary adjudication of the second claim for age discrimination is GRANTED.[29]

---

[29] There is also evidence that Plaintiff characterized Woolston as "very helpful" after Woolston she straightened out Plaintiff's light duty/medical benefits grievance.  Plaintiff's briefing does

1       **C.   <u>Wrongful Termination (Claim III)</u>**

2       **Plaintiff's third claim for termination in violation of public**

3  **policy is based on the same facts as Plaintiff's disability**

4  **discrimination claim.   Plaintiff argues that her third cause of**

5  **action for "tortious interference in violation of public policy"**

6  **withstands summary adjudication because "the undisputed facts**

7  **clearly support Plaintiff's claim that AMR not only failed to engage**

8  **her in the interactive process, but by extension, failed to provide**

9  **reasonable accommodations in violation of her rights under [the**

10 **FEHA]."  (Doc. 61, 17:7-17:9).**

11      **To prevail on a claim of wrongful termination in violation of**

12 **public policy, a plaintiff employee must establish the existence of**

13 **a public policy, a nexus between his/her termination and the**

14 **protected activity related to that public policy, and damages**

15 **resulting from the termination.   *See, e.g., Turner v.***

16 ***Anheuser-Busch, Inc.*, 7 Cal.4th 1238, 1258-59 (1994).   The public**

17 **policy at issue in this cause of action is FEHA's policy against**

18 **termination on the basis of disability.**

19      **AMR argues that the wrongful termination claim is identical to**

20 **the claim for disability discrimination and is therefore redundant**

21 **and unneeded.   Plaintiff acknowledged the cumulative nature of the**

22 **wrongful termination claim at oral argument.   She does not oppose**

23 **granting the motion.   As such, AMR's motion for summary adjudication**

24 **of the third cause of action for wrongful termination is GRANTED.**

25

26

27
   ─────────────────────
   not reconcile Woolston's alleged discriminatory statements with her
28 positive personal feelings towards Woolston.

1      D.   Retaliation (Claim IV)

2          Plaintiff claims that AMR retaliated against her for attempting

3  to engage in the interactive process, retaining counsel, and filing

4  a DFEH complaint.   AMR responds that Plaintiff cannot establish a

5  prima facie case and, assuming she can, there is no evidence of

6  pretext.[30]

7          A plaintiff establishes a prima facie case of retaliation under

8  the FEHA by demonstrating:  1) she engaged in protected activity; 2)

9  she was subjected to an adverse employment action; and 3) there is

10  a causal link between the two.  *See Morgan v. Regents of Univ. of*

11  *Cal.*, 88 Cal. App. 4th 52, 69 (2001).  Defendant may rebut the prima

12  facie case by presenting a legitimate business rationale, which the

13  plaintiff may then overcome by showing the employer's rationale is

14  a pretext for retaliation.  *Stegall v. Citadel Broad. Co.*, 350 F.3d

15  1061, 1066 (9th Cir. 2003).  Assuming, *arguendo*, that Plaintiff

16  engaged in protected activity and was subjected to an adverse

17  employment action, the claim fails because there is no evidence to

18  establish a causal link between the protected activity and any

19  alleged adverse employment action.

20          According to Plaintiff, she satisfies the first element of a

21  prima facie case based on her first DFEH complaint in 2003.

22  However, Plaintiff's first complaint was fully resolved in 2003,

23  more than three years prior to the alleged adverse actions forming

24  the substance of this action.   Plaintiff worked at AMR as a

25

26          [30] In particular, AMR maintains that Plaintiff's retaliation
27  claim fails because it "accommodate[d] her disability, no other
   accommodation was available, and Plaintiff cannot prove that the
28  reason is untrue or pretextual."

paramedic from 2003 through 2006, yet she did not report any other acts of discrimination.  There is no evidence that any AMR employees "retaliated" against her in the workplace or that she experienced any "hostility" based on the 2003 DFEH complaint.

There is also no evidence to support a retaliation claim based on the second DFEH complaint or the retention of counsel, which both occurred in 2006.  This evidence is insufficient because the alleged adverse actions - refusing to provide light duty work or engage in the interactive process - allegedly took place in January 2005, prior to any "protected activity."  Critically, Plaintiff filed a DFEH complaint and retained counsel *one year after* the alleged improper conduct.  Here, the undisputed timeline forecloses any assertion that the DFEH complaint and/or the retention of counsel was the catalyst for any adverse employment action.  Plaintiff's arguments are without merit.

Defendant's motion for summary adjudication is GRANTED as to Plaintiff's fourth claim for retaliation in violation of the FEHA.

E.   *Breach of Employment Contract & Implied Covenant Claims*

Defendant moves for summary adjudication on Plaintiff's claims for breach of contract and implied covenant of good faith and fair dealing for three reasons: (1) plaintiff's state law claim is preempted by § 301 of the LMRA, 29 U.S.C. § 141 et seq.; (2) Plaintiff's claim is barred by § 301's six-month statute of limitations; and (3) even if Plaintiff's claim was not time-barred, her claim fails because Plaintiff was never terminated.

Plaintiff, citing no law, opposes summary adjudication on her contract claim.  Plaintiff denies her claim is subject to federal

labor law, contending that the CBA requires Defendant to "abide by
all applicable laws regarding the treatment of disabled employees
[...] Plaintiff's cause of action for breach of contract is founded
entirely on AMR's violation of [FEHA] [] [i]t is not a right created
by the CBA."  Plaintiff argues that the CBA merely "borrows" its
anti-discrimination provisions from California law and "it is not
necessary that the language of the CBA be carefully parsed to
determine if a breach occurred."

    Section 301 of the LMRA provides exclusive federal jurisdiction
over "suits for violation of contracts between an employer and a
labor organization."  29 USC § 185(a); *see Young v. Anthony's Fish
Grottos, Inc*., 830 F.2d 993, 997 (9th Cir. 1987) ("[A] suit for
breach of collective bargaining agreement is governed exclusively by
federal law under section 301.").  Section 301 of the LMRA preempts
state law claims premised on rights created by a CBA as well as
claims that are substantially dependent on the interpretation of a
CBA.  *Aguilera v. Pirelli Armstrong Tire Corp*., 223 F.3d 1010, 1014
(9th Cir. 2000).  In other words, preemption is required if the
state law claim can be resolved only by referring to the terms of a
CBA.  *Newberry v. Pacific Racing Ass'n*, 854 F.2d 1142, 1146 (9th
Cir. 1988); *Walton v. UTV of San Francisco, Inc*., 776 F.Supp. 1399,
1402 (N.D.Cal. 1991) ("[I]nterpretation of a CBA must be required in
a state cause of action for that action to be preempted by § 301.").

    The contract provisions about which Plaintiff complains are
found in the CBA.  To support her contract claim, Plaintiff points
specifically to the CBA, arguing that the CBA's provisions
"unequivocally require AMR to abide by all applicable laws regarding
the treatment of disabled employees."  Applying Plaintiff's

1 reasoning, her contract claim depends only on whether Defendant

2 discriminated against her based on her age and disability in

3 violation of the FEHA.   In order to make that determination,

4 however, the Court must refer to and interpret the provisions of the

5 collective bargaining agreement.   As the CBA supplies the language

6 and right allegedly violated, Plaintiff's state law claim for breach

7 of contract is necessarily preempted.[31]

8     In *Cramer v. Consolidated Freightways, Inc.*, 255 F.3d 683 (9th

9 Cir. 2001), the Ninth Circuit explained:

10        If the plaintiff's claim cannot be resolved without

11        interpreting the applicable CBA - as, for example, in *Allis-Chalmers*, where the suit involved an employer's

12        alleged failure to comport with its contractually established duties - it is preempted.   Alternatively,

13        if the claim may be litigated without reference to the rights and duties established in a CBA - as, for

14        example, in *Lingle*, where the plaintiff was able to litigate her retaliation suit under state law without

15        reference to the CBA - it is not preempted.

16 Id. at 691.[32]

17     Here, the viability and resolution of Plaintiff's contract

18 _____

19     [31] Plaintiff's claim for breach of the implied covenant of good

20 faith and fair dealing is preempted for the same reasons.

21     [32] In *Cramer*, the Ninth Circuit summarized the Supreme Court's

22 holding in *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985): In Allis-Chalmers [] the Court expanded application of § 301

23 preemption beyond cases specifically alleging contract violation to those whose resolution 'is substantially dependent upon analysis of

24 the terms of an agreement made between the parties in a labor contract.'   Allis-Chalmers involved an employee's suit alleging his

25 employer had handled his claim for disability benefits in bad faith, thereby violating state tort law.   Because the method of

26 handling disability claims was specified in the CBA governing Lueck's employment, the Court interpreted his claim as essentially

27 a recharacterized action for breach of the CBA, and held that it was preempted under § 301."  *Id*. at 689 (citations omitted).

28

1 claim is entirely dependent on the CBA's terms and is preempted
2 under well-established Ninth Circuit law.

3     A preemption finding is reinforced by a review of the arguments
4 advanced in Plaintiff's opposition, which incorporate language from
5 *Ramirez v. Fox Television Station, Inc.*, 998 F.2d 743 (9th Cir.
6 1993).   There, the Ninth Circuit held that claims asserting
7 nonnegotiable state-law rights, such as rights provided to employees
8 under the FEHA, are not preempted by § 301.   Plaintiff, however,
9 misunderstands the Ninth Circuit's holding in *Ramirez,* which
10 discussed preemption in the context of stand-alone causes of action
11 asserting nonnegotiable state-law rights.   *Ramirez* did not hold that
12 separate state law breach of contract claims, allegedly premised on
13 an underlying FEHA violation, withstand preemption challenges.
14 Plaintiff's attempt to expand the outer boundaries of federal
15 preemption law is unavailing.

16     The Supreme Court has held that actions under the LMRA are
17 governed by the six-month statute of limitations set out in § 10(b)
18 of the National Labor Relations Act.   *DelCostello v. Teamsters*, 462
19 U.S. 151, 163-164 (1983).   Claims outside of that six-month period
20 are subject to dismissal.   *Id*. at 155.   Here, accepting Plaintiff's
21 facts as true, the conduct giving rise to this lawsuit occurred in
22 early 2006.   Plaintiff filed this action on February 20, 2008, more
23 than 650 days after the alleged incidents forming the basis for this
24 litigation.   Her claims are time-barred under § 10(b).

25     AMR's motion for summary adjudication is GRANTED as to
26 Plaintiff's fifth claim for breach of contract and sixth claim for
27 breach of the implied covenant of good faith and fair dealing.

28

**45**

1        **F.    _Punitive Damages_**

2        **Plaintiff seeks punitive damages on her FEHA claims, as well**
3   **her state law claims for wrongful termination in violation of public**
4   **policy, breach of contract, and breach of the implied covenant of**
5   **good   faith   and   fair   dealing.    Defendant   contends   that   the**
6   **Plaintiff's   punitive   damages   claim   fails   because   she   "has   no**
7   **evidence   of   the   malice,   oppression,   or   fraud   required   to   impose**
8   **punitive damages."  Plaintiff rejoins that Defendant has "engaged in**
9   **long-standing   and   intentional   misrepresentation   [...]   with   the**
10  **intention of depriving Plaintiff her legal rights to be engaged in**
11  **the   interactive   process   and   to   be   reasonably   accommodated   for**
12  **whatever limitations she had."**

13       **California  Civil  Code  Section  3294(a)  states  that  punitive**
14  **damages be recovered "where it is proven by clear and convincing**
15  **evidence that the defendant has been guilty of oppression, fraud or**
16  **malice."   Malice is defined as "conduct which is intended by the**
17  **defendant to cause injury to the plaintiff or despicable conduct**
18  **which is carried on by the defendant with a wilful and conscious**
19  **disregard of the rights or safety of others."   Cal. Civ. Code §**
20  **3294(c)(1).    California  Civil  Code  Section  3294(c)(2)  defines**
21  **oppression as "despicable conduct that subjects a person to cruel**
22  **and unjust hardship in conscious disregard of that person's rights."**
23  **Fraud is "an intentional misrepresentation, deceit or concealment of**
24  **a material fact known to the defendant or thereby depriving a person**
25  **of property or legal rights or otherwise causing injury.  Cal. Civ.**
26  **Code § 3294(c)(3).**

27       **Section  3294  permits  punitive  damages  against  a  corporate**
28  **employer  if  the  offending  employee  is  sufficiently  high  in  the**

46

corporation's decision-making hierarchy to be an "officer, director or managing agent." Cal. Civ. Code, § 3294(a),(b); *White v. Ultramar, Inc.*, 21 Cal.4th 563, 572 (1999); *see also Cruz v. HomeBase*, 83 Cal. App. 4th 160, 167 (2000) ("Managing agents' are employees who exercise substantial discretionary authority over decisions that ultimately determine corporate policy [...]"). As the California Court of Appeal explained:

> This is the group whose intentions guide corporate conduct. By so confining liability, the statute avoids punishing the corporation for malice of low-level employees which does not reflect the corporate "state of mind" or the intentions of corporate leaders. This assures that punishment is imposed only if the corporation can be fairly viewed as guilty of the evil intent sought to be punished.

*Cruz*, 83 Cal. App. 4th at 166.

Section 3294 also requires proof of wrongful conduct among corporate leaders: the "officer[s], director[s], or managing agent[s]." Cal. Civ. Code, § 3294(b); *Cruz*, 83 Cal. App. 4th at 166.

AMR asserts that Plaintiff's claim for punitive damages fails because there is no evidence that any managing agent acted oppressively, fraudulently, or maliciously against Plaintiff. AMR further argues that neither the mere refusal to permit Plaintiff to return to her job, nor the alleged refusal to accommodate her disability by modifying her job duties, nor the alleged refusal to engage in the interactive process, rises to the level of oppression, fraud, or malice.

In opposition, Plaintiff contends that she has a claim for punitive damages, based on evidence showing that Defendant was indifferent toward the rights of employees who were considered

1  disabled under FEHA, and who sought to return to work with
2  restrictions following disabling, workplace injuries.  However,
3  Plaintiff does not address who was a "managing agent" at AMR,
4  certainly not Ms. Woolston;  nor does she isolate what exact
5  conduct, other than alleged misinterpretation of her disability and
6  a refusal to engage in the interactive process, subjects AMR to
7  punitive liability under § 3294.  The evidence is marginal to
8  support an award of punitive damages against AMR.  Absent
9  identifying a managing agent to whom intentional discrimination is
10 attributable this issue will not survive a Rule 50 motion.  The
11 granting of this motion is reserved.

12      While punitive damages may be available under some
13 circumstances for FEHA violations, *see, e.g., Brewer v. Premier Golf
14 Props.*, 86 Cal.Rptr.3d 225 (2008), Plaintiff's evidence of
15 oppression, fraud, or malice, is arguably insufficient to support an
16 award of punitive damages.  Plaintiff has failed to show - or even
17 allege - that a managing agent, officer, or director of Defendant
18 authorized, ratified, or personally engaged in oppressive,
19 fraudulent, or malicious conduct, which will bar the claims against
20 AMR.

21 //
22 //
23 //
24 //
25 //
26 //
27 //
28 //

48

1

VI.   <u>CONCLUSION</u>

2

For the reasons discussed above:

3

4      1.   Defendant AMR's motion on the first claim for disability

5           discrimination under the FEHA is DENIED.

6

7      2.   Plaintiff and AMR's motions regarding the alleged failure

8           to accommodate Plaintiff's disability under the FEHA are

9           DENIED.

10

11     3.   Plaintiff and AMR's motions regarding the alleged failure

12          to engage in the interactive process under the FEHA are

13          DENIED.

14

15     4.   AMR's motion for summary adjudication on Plaintiff's

16          second claim for age discrimination claim under the FEHA

17          is GRANTED.

18

19     5.   AMR's motion for summary adjudication on Plaintiff's third

20          cause of action for wrongful termination is GRANTED.

21

22     6.   AMR's motion for summary adjudication on Plaintiff's

23          fourth claim for retaliation in violation of the FEHA is

24          GRANTED.

25

26     7.   AMR's motion for summary adjudication as to Plaintiff's

27          fifth claim for breach of contract and sixth claim for

28          breach of the implied covenant of good faith and fair

1        **dealing is GRANTED.**

2

3    **8.   AMR's motion on Plaintiff's request for punitive damages**

4        **is RESERVED for motion in limine.**

5

6    **Defendant shall submit a form of order consistent with this**

7 **memorandum decision within five (5) days of electronic service.**

8

9    **A Status Conference is scheduled for Thursday, August 5, 2010**

10 **at 9:00 a.m. to set a trial date and associated deadlines.   The**

11 **parties may appear telephonically.**

12

13 **SO ORDERED**

14 **Dated: July 28, 2010**                **/s/ Oliver W. Wanger**

15                            **Oliver W. Wanger**

16                            **United States District Judge**

17

18

19

20

21

22

23

24

25

26

27

28